SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STEVEN B. SACKS, Cal. Bar No. 98875
ssacks@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
SHADI MAHMOUDI, Cal. Bar No. 301610
smahmoudi@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone:  415-434-9100
Facsimile:  415-434-3947

Attorneys for Creditor and Plaintiff,
MUFG UNION BANK, N.A.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>ROBERT BROWER, SR.,<br><br>        Debtor. | Case No. 15-50801<br><br>Chapter 11 |
| MUFG UNION BANK, N.A.,<br><br>        Plaintiff,<br><br>   v.<br><br>ROBERT BROWER, SR.,<br><br>        Defendant. | Adv. Proc. No. _____<br><br>**MUFG UNION BANK, N.A.'S COMPLAINT FOR:**<br><br>**(I) DETERMINATION OF NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(B), AND 523(a)(4); AND**<br><br>**(II) DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §§ 727(a)(2), and 727(a)(3)** |

1

Case: 15-05119    Doc# 1    Filed: 08/14/15    Entered: 08/14/15 13:09:00    Page 1 of 15
SMRH:445419356.5                                                    COMPLAINT FOR NON-DISCHARGEABILITY

Creditor MUFG Union Bank, N.A. ("Bank" or "Plaintiff"), plaintiff herein, alleges as follows:

**PARTIES**

1. Plaintiff Bank is a nationally chartered bank with its headquarters in New York, New York. Plaintiff is the successor by merger to Santa Barbara Bank & Trust, N.A. (f/k/a Pacific Capital Bank, N.A.) ("Original Lender"), and on December 1, 2012 it succeeded to the Original Lender's interest in the Loan and the Guaranty (each as defined below) that form the basis of the Bank's claim against Brower. References herein to "Bank" include Original Lender and any predecessors to Bank or Original Lender as to the Loan and the Guaranty.

2. Defendant Robert S. Brower, Sr. ("Brower" or "Debtor") is the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), and resides in Carmel, California. At all relevant times, Brower was the President of Chateau Julien, Inc. ("Chateau Julien"), a California corporation. Brower referred to himself in writing as the "proprietor" of Chateau Julien. Brower was also the president of American Commercial Properties, Inc. and of Coastal Cypress Corporation. The Bank and its predecessors reasonably understood and believed based on Brower's statements and actions that Brower was the owner of Chateau Julien and American Commercial Properties, and of at least a one-half interest in Coastal Cypress.

**JURISDICTION AND VENUE**

3. This adversary proceeding arises under title 11, or arises in or is related to the Bankruptcy Case, within the meaning of 28 U.S.C. § 1334(b). This Court therefore has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b), 1334(b) and 1334(e) and Rule 5011-1 of the Bankruptcy Local Rules of the United States District Court for the Northern District of California, including jurisdiction to enter a final judgment.

4. This is an adversary proceeding to determine the dischargeability of debts owed by the Debtor to the Bank and to determine whether the Debtor should be entitled to a discharge generally, and therefore is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J), and (O). To the extent necessary, Plaintiff consents to entry of a final judgment by this Court.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

6. Brower is subject to the jurisdiction of this Court due to, among other things, his voluntary bankruptcy filing in this Court.

## GENERAL FACTUAL ALLEGATIONS

7. Brower commenced this bankruptcy case on March 11, 2015 (the "Petition Date") by filing a voluntary petition under chapter 11 of the Bankruptcy Code. Bank has filed a proof of claim as Claim No. 7 on the claims register in this case, in the amount of $5,091,299.30, based on certain guaranty obligations as set forth in said proof of claim (the "Proof of Claim").

**A. General Background of the Bank's Guaranty Claim Against Brower.**

8. On and prior to the Petition Date, Chateau Julien operated a winery in Carmel, California.

9. Beginning at least by 2004, Bank had loaned monies to Chateau Julien on a yearly revolving line of credit which was guaranteed by Brower. Over time, Chateau Julien requested and Bank agreed to increase the principal amount of the line of credit and it was ultimately increased to $4,850,000 and renewed yearly thereafter. Each year in advance of the maturity date of the line of credit Bank requested that Brower and Chateau Julien furnish to it sufficient financial information to justify an increase, renewal or extension of the line. Bank justifiably relied on the financial information supplied by Brower and by him on behalf of Chateau Julien as being true and correct and would not have increased, extended or renewed the line of credit but for having received such information, including the individual financial information pertaining to Brower.

10. The line of credit was most recently amended and restated in a Loan and Security Agreement dated May 15, 2009 (the "Loan"), by and between Chateau Julien and Bank (as amended from time to time, the "Loan and Security Agreement"). A true and correct copy of the Loan and Security Agreement, which is incorporated herein by reference, is attached hereto as Exhibit A.

11. Brower's guaranty to induce Bank to grant Chateau Julien the line of credit was made, executed, and delivered to Bank by Brower in an Unlimited Guaranty dated April 28, 2004 (the "Guaranty"), which Brower reaffirmed as of the time of the Loan and Security

Agreement and further reaffirmed several times thereafter, most recently in the Consent of Guarantor and Waiver of Jury Trial dated as of September 30, 2013 and attached to the Sixth Extension. A true and correct copy of the Guaranty, which is incorporated herein by reference, is attached hereto as <u>Exhibit B</u>.

12. The Guaranty states (i) that "the Bank may collect from Guarantor without first foreclosing on any real or personal property collateral" and (ii) that "Guarantor hereby expressly waives any and all benefits or defenses which otherwise might be available to Guarantor under California Civil Code Sections 2799, 2808, 2809, 2815, 2819, 2820, 2821, 2822, 2838, 2839, 2845, 2849, 2850, 2899 and 3433." (Exh. B, at 1.)

13. The security for the Loan included Chateau Julien's accounts, chattel paper, inventory, contract rights, general intangibles, supporting obligations, proceeds of the foregoing, and records and products of the foregoing. (Exh. A, § 2.2(d)). The Bank's security interest in said collateral was duly perfected by the filing of certain UCC-1 financing statements with the California Secretary of State.

14. The Loan was further extended and modified pursuant to (i) that certain Extension Agreement entered into as of June 20, 2011 by and between Chateau Julien and Bank (the "First Extension"), (ii) that certain Modification Agreement entered into as of December 15, 2011 by and between Chateau Julien and Bank (the "Second Extension"), (iii) that certain Extension Agreement entered into as of June 20, 2012 by and between Chateau Julien and Bank (the "Third Extension"), (iv) that certain Modification Agreement entered into as of November 6, 2012 by and between Chateau Julien and Bank (the "Fourth Extension"), (v) that certain letter agreement dated as of March 15, 2013 made by Chateau Julien and Plaintiff (the "Fifth Extension"), and (vi) that certain letter agreement dated as of September 30, 2013 made by Chateau Julien and Plaintiff (the "Sixth Extension" and collectively with the First Extension, the Second Extension, the Third Extension, the Fourth Extension, and the Fifth Extension, the "Extension Agreements"). True and correct copies of the Extension Agreements, which are incorporated herein by reference, are attached to hereto as <u>Exhibit C</u>. The Bank received from Brower and Chateau Julien their financial statements and supporting financial information in

connection with these extensions and renewals and relied thereon in agreeing to renew or extend the Loan.

15. The Loan is further evidenced by an Amended and Restated Revolving Term Note dated as of May 15, 2009, made by Chateau Julien and payable to the order of Bank, in the stated principal amount of $4,850,000 (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit D.

16. The Loan and Security Agreement, the Extensions, the Note, and the Guaranty and all related documents are collectively referred to herein as the "Loan Documents".

17. Chateau Julien defaulted under the Loan by, among other things, failing to pay all outstanding principal and interest under the Note at the Note's extended maturity date of November 2, 2013 (the "Existing Default"). Brower defaulted on the Guaranty by failing to satisfy Chateau Julien's obligations under the Loan.

18. On March 27, 2014, Plaintiff sent Chateau Julien a default letter (the "March 27 Default Letter") notifying Chateau Julien of the Existing Default and demanding that Chateau Julien cure the Existing Default by April 14, 2014. On April 16, 2014, Plaintiff sent Chateau Julien and Brower a second default letter (the "April 16 Default Letter" and together with the March 27 Default Letter, the "Default Letters") further providing notice of the Existing Default, and implementing the default rate of interest under the Loan Documents. On September 26, 2014, the Bank sent Chateau Julien and Brower a Notice of Disposition of Collateral, advising them that as a result of Chateau Julien's default under the Loan, the Bank would sell the Loan collateral at one or more private sales. On March 17, 2015, the Bank gave notice to Chateau Julien that it was to hold the proceeds and collections of the Loan collateral in trust for the Bank and that it was to assemble all of the collateral and make it available to the Bank or a receiver appointed by the court.

19. After efforts to reach a settlement failed, the Bank filed a lawsuit against Brower and Chateau Julien in Monterey County Superior Court for breach of contract, breach of guaranty, and certain other causes of action (the "State Court Action"). No judgement has yet been entered in the State Court Action.

20. Following the default letters in 2014 mentioned above, neither Brower nor Chateau Julien have made any payments on the Loan, other than certain contract rate interest only payments tendered by Chateau Julien, which were refused after the filing of the litigation. As of the March 11, 2015 petition date in this case, the balance of the Loan was as follows:

| | |
|---|---|
| Principal | $4,849,887.07 |
| Contract Rate Interest @ Prime + 2.00% (*i.e.,* 5.25% on 3/11/15) | $122,433.49 |
| Default Interest @ 3.00% above contract rate | $109,783.96 |
| Late Charges | $9,194.78 |
| ***TOTAL*** | ***$5,091,299.30*** |

21. The entirety of the foregoing loan balance was due and owing on the petition date by Chateau Julien as borrower and by Brower as guarantor.

**B.     Brower Provides Misleading Financial Statements to Obtain and Extend Credit**

22. In connection with obtaining, increasing, renewing and extending the Loan, which was guaranteed by Brower, Brower personally created and provided to the Bank and its predecessor lenders his personal financial statements, as guarantor of the Loan. The financial statements were provided in connection with each renewal, extension or refinancing of the Loan, including in 2009 when the Loan and Security Agreement, Note, and Guaranty were signed. The financial statements provided by Brower to the Bank and its predecessor lenders purported to reflect the joint assets of Brower and his wife, Patricia Brower, indicating that these assets were available to support Brower's guaranty of the Loan. When Brower supplied back-up information for the financial statements they appeared to reflect the value of either assets held jointly, such as a joint checking account, or assets held in Brower's name. No assets were listed as being separately held by Brower or Patricia Brower, indicating that the assets listed were jointly held.

23. In the financial statements, Brower represented himself as being in a very strong financial position, with net assets of, for example, nearly $10 million at year-end 2009, $9.9 million for 2011 and $9.3 million for 2013. In his bankruptcy filing just a short time later, Brower claims to have nearly no assets based on his newly-made assertion that most of the assets shown on the prior financial statements did not belong to him or did not have any value at all, which he

6

SMRH:445419356.5                                                                                    COMPLAINT FOR NON-DISCHARGEABILITY

conveniently and intentionally failed to disclose to the Bank while using the financial statements to obtain extensions, refinancings and renewals of the Chateau Julien Loan that Brower guaranteed. The financial statements falsely represented Brower's financial condition because they (1) included assets that Brower now asserts to be the sole and separate property of his wife, (2) included the value of assets that did not belong to either Brower or his wife, (3) overstated the value of assets in which Brower did have an interest, and (4) listed assets that were non-existent. As described more specifically below, these misrepresentations relate to all of the significant assets on Brower's financial statements, including the value of Brower's interest in Chateau Julien, American Commercial Properties, Inc., and Coastal Cypress Corporation.

24. Chateau Julien's shares were claimed by Brower to have a value of $1.8 million as recently as December 31, 2013. Each financial statement provided to the Bank listed as a jointly held asset of Brower and his wife the *entire* book value of the equity interests in Chateau Julien, even though Brower now asserts that none of the equity ever belonged to him at all, that Patricia Brower only owns 50% of the equity, and that the shares held by Patricia Brower are her separate property. Brower claims now that he has no interest in the Chateau Julien equity listed on his financial statements.

25. Brower listed the common stock in American Commercial Properties as being worth from $1.1 to $1.5 million on the financial statements, but Brower now says he gave his entire interest to his wife as her separate property in 2000. As with Chateau Julien, Brower was the president of the company and managed its affairs and gave no indication to the Bank or anyone else that he was no longer the owner of the company. As with Chateau Julien, Brower claims that he has no interest in this asset listed on the financial statements.

26. With regard to Coastal Cypress Corporation, Brower exaggerated the value of his assets by providing false statements as to the value of his interest. Brower's financial statements from 2009-13 showed the value of his interest increasing from $2.2 million in 2009 to almost $3.5 million in 2013. In preparing the financial statements, Brower listed one-half of the net equity in Coastal Cypress' real estate as the jointly held value. In doing so, Brower substantially overstated the actual value of his interest in Coastal Cypress. First, Brower now

claims that beginning in 2011 he and Patricia Brower did not together own one-half of Coastal Cypress, as shown on the financial statements. Rather, he claims that in 2011 he caused Coastal Cypress to effectively give away over 25 percent of its equity to new shareholders in 2011 by selling shares at the same purchase price at which shares had been offered in 1983, leaving him with approximately 24 percent of the company and Patricia Brower with 13 percent. Second, Brower included on the financial statements the value of shares that he now claims belong to Patricia Brower as her separate property. Third, Brower's financial statements substantially overstated the actual value of his interest in Coastal Cypress because he failed to account for the obligations that Coastal Cypress had for taxes upon any sale of its real property. The cumulative effect of these misstatements is that Brower claims that the value of his interest in Coastal Cypress is not the $3.5 million listed on the 2013 financial statement but only $584,000 (before taxes), even though Coastal's real property was sold for nearly the same amount as listed on the 2013 financial statement.

27. The financial statements also included an asset that did not exist, which was referred to variously as the purported "value of winery business," the "value of wine trademarks-brands," or the "value of wine distribution." The financial statements included values ranging from $2 to $2.5 million for this asset.

28. The effect of listing assets in which Brower claims to have no interest on the financial statements provided to the Bank and its predecessors in interest was to overstate Brower's assets available to satisfy his Guaranty obligations by nearly the entire amount of the assets listed on the financial statements. Rather than $9 or $10 million of assets, Brower now claims to have assets of under $1 million.

29. It was not until after the Bank obtained a writ of attachment against Brower in January 2015, that the Bank learned that Brower asserted that he had no interest in Chateau Julien and American Commercial Properties Inc., either of his own or as community property with his wife, which would be available to satisfy claims under the Guaranty. Only after Brower's bankruptcy filing did he reveal the actual value of his interest in Coastal Cypress.

## C. Brower Causes Chateau Julien to Sell Off Nearly All of Its Inventory After Receiving the Default Letters.

30. While the Guaranty is unsecured, the Loan is secured by substantially all of the assets of Chateau Julien, as discussed in paragraph 13 above. Two of the primary elements of this collateral were the inventory and the accounts receivable of Chateau Julien.

31. As provided under Section 2.7 of the Loan and Security Agreement, the Bank conducted an annual audit of the collateral for the Loan in order to verify statements made to the Bank by Brower as president of Chateau Julien in the borrowing base certificates provided to the Bank.

32. The last audit permitted by Brower, as President of Chateau Julien, was conducted in June 2013. The Bank's auditor reported that at the time, Chateau Julien had over 18,000 cases of cased goods (i.e., bottled wine), and over 75,000 gallons of bulk wine. The Bank's auditor concluded at the time that the inventory was worth approximately $3.8 million.

33. Brower, as President of Chateau Julien, refused to permit the Bank to conduct its collateral audit in 2014. However, he continued to provide the Bank with borrowing base certificates that reflected inventory values similar to those in the 2013 audit report. For example, the borrowing base certificate provided by Brower as President of Chateau Julien as of May 31, 2014 reflected a total inventory value of approximately $8.6 million on a cost basis, which was roughly equal to the values reported in prior years. In addition, the same borrowing base certificate reflected accounts receivable of approximately $386,889.

34. In mid to late April 2015, Chateau Julien ceased operating its business. This occurred when Coastal Cypress Corporation ("Coastal Cypress"), the company that owned the real property leased by Chateau Julien for its business operations, closed the sale of the real property to a third party. As a condition of the sale, Chateau Julien was required to and did vacate the premises.

35. Around this same time, Brower on behalf of Chateau Julien finally permitted the Bank to inspect the wine inventory that was part of its collateral. In connection with this inspection, the Bank was provided an inventory listing of the inventory of Chateau Julien,

which inventory was now stored in two warehouses – one in San Jose, CA and one in Salinas, CA. The inventory listing reflected no bulk wine and 2,645 cases of cased goods.  The Bank is informed and believes that the present value of the inventory is at best only slightly in excess of the cost of liquidating it.

36. The inventory remaining in April 2015 included no bulk wine and a fraction of the cased goods that were on hand in June 2013.  Further, according to Brower, Chateau Julien no longer had any accounts receivable in April 2015.  Finally, despite having liquidated all of the salable inventory and its accounts receivable, Chateau Julien only had less than $30,000 in cash.

37. At no time before the cessation of business did Brower inform the Bank that he was causing the inventory of Chateau Julien to be sold off without replacing it in the normal course of business, thereby completely eroding the collateral base for the Loan.  Instead, Brower represented to the Bank that the value of the collateral was virtually unchanged, that Chateau Julien was continuing its business regardless of its business location, and that it wanted the use of the Bank's collateral for those operations as late as April 8, 2015.

**D.     Brower Destroys Chateau Julien's Records.**

38. As provided in Section 2.2(d) of the Loan and Security Agreement, the Bank's collateral included all "general intangibles" and all "records" of any of the other items of collateral.  The Bank's collateral for the Loan thus included all or at least substantially all of the books and records of Chateau Julien.

39. On March 17, 2015, the Bank sent a letter to Chateau Julien demanding that, per Section 2.3 of the Loan and Security Agreement, all of the collateral for the Loan and all proceeds of the collateral be held in trust by Chateau Julien for the benefit of the Bank.

40. Subsequently, on April 9, 2015, the Bank filed a noticed motion to appoint a receiver over Chateau Julien in the State Court Action, including to take possession of the books and records.

41. After receiving the March 17, 2015 letter, and while the noticed motion to appoint a receiver was pending, Brower in his capacity as President of Coastal Cypress closed the sale of the real estate leased by Chateau Julien from Coastal Cypress and caused Chateau Julien to

-10-
SMRH:445419356.5                                                                                         COMPLAINT FOR NON-DISCHARGEABILITY
Case: 15-05119    Doc# 1    Filed: 08/14/15    Entered: 08/14/15 13:09:00    Page 10 of 15

vacate the premises. At the time Chateau Julien left the Coastal Cypress property in mid-April 2015, Brower caused the books and records of Chateau Julien to be destroyed. The books and records destroyed included those stored on the computers of Chateau Julien, which Brower had destroyed or recycled, as well as the printed books and records, which Brower admits were trashed. Brower also claims to have deleted all email pertaining to or constituting Chateau Julien's records and all electronic records of Chateau Julien's operations and of the Bank's collateral.

**E.  Brower Uses American Commercial Properties to Hide Assets from Creditors**

42. Brower formed American Commercial Properties in or about 1983. American Commercial Properties purchased Brower's residence located in Carmel, California (the "Residence") in 1992. The purchase price for the Residence was $385,000, of which $250,000 was financed and secured by a deed of trust on the Residence. The $250,000 secured note encumbering the property is scheduled to be fully repaid in 2022. At the time of the purchase of the Residence, and at all times thereafter up until July 2015, Brower was the President of American Commercial Properties. According to Brower, his wife Patricia became the President of American Commercial Properties in July 2015, after this bankruptcy case was filed.

43. At the time the Residence was purchased, Brower owned 100% of the common stock of American Commercial Properties. In or about November of 2000, Brower claims that he transferred all of his common stock in American Commercial Properties to Patricia Brower, and that she is the present owner of this stock.

44. American Commercial Properties leases the Residence to Brower and Patricia Brower as their primary residence. Despite the fact that both lease and occupy the Residence, Brower makes 100% of the rental payments with his sole and separate property. Patricia makes no payments but receives all of the benefit of said payments as they are used to pay down the loan securing the Residence and as they accumulate cash in her 100% owned company, American Commercial Properties. Brower claims the currently monthly rent for the Residence is $2,986.78, an amount significantly greater than the monthly payments on the 30-year note taken out in 1992.

45. Through this arrangement, Brower transfers funds to Patricia Brower and away from his creditors and his bankruptcy estate. Brower is the sole guarantor of the Loan to Chateau Julien and had also solely guaranteed a related loan to Coastal Cypress that was repaid when the sale of the Coastal Cypress property closed in April 2015. The aggregate balance of these two loans was in excess of $9 million prior to the repayment of the Coastal Cypress loan. The joint financial statements of Brower and his wife confirm these two guaranties as the primary liabilities of Brower and his wife. For example, the joint financial statement provided by Brower to the Bank as of December 31, 2013 reflects $32,762 in accounts payable as being the only liabilities of Brower and his wife, collectively. A true and correct copy of the December 31, 2013 financial statement is attached hereto as Exhibit E.

46. The creation of a lease for the Residence with monthly payments greatly exceeding anything that may be owed under the secured note, the payment by Brower of 100% of those lease obligations, and the ownership by Patricia Brower of 100% of the equity in American Commercial Properties makes it clear that this structure is intended to and does funnel money out of the hands of Brower and Brower's bankruptcy estate, where it may be used to satisfy claims of creditors, and into the hands of Patricia Brower. Thus, Brower is able to enjoy all of the use and benefit of the Residence and the funds transferred to American Commercial Properties (indeed, until July 2015 he was the President of American Commercial Properties), while Brower's creditors are not able to realize on these funds and assets for the repayment of Brower's debts. Since the great majority of Mr. and Mrs. Brower's creditors are creditors of Mr. Brower only, this structure is clearly intended to hide Brower's assets from his creditors while ensuring that he is still able to enjoy the full use of said assets.

## FIRST CLAIM FOR RELIEF

### (For Non-Dischargeability of Debt to the Bank Pursuant to 11 U.S.C. § 523(a)(2)(B))

47. Plaintiff Bank repeats and realleges the allegations in above paragraphs 1 through 46, inclusive, as though fully set forth herein.

48. Brower intentionally provided materially false and misleading written financial statements to the Bank in connection with renewals, extensions, and refinancings of the

Loan. The financial statements were materially false written statements concerning the financial condition of Brower, the guarantor of the Loan, on which the Bank reasonably relied in renewing, extending, and refinancing the Loan. Brower, knowing that the financial statements were requested in his capacity as guarantor of the Loan, issued these financial statements with the intent to deceive the Bank and its predecessors.

49. As a result, the debt owed by Brower to the Bank is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) as it is a debt for an extension, renewal, or refinancing of credit (approximately $5 million) obtained by Brower through the use of statements in writing that were materially false, that respected Brower's financial condition, on which the Bank and its predecessors reasonably relied, and that Brower made with the intent to deceive.

WHEREFORE, the Bank prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### (For Non-Dischargeability of Debt to the Bank Pursuant to 11 U.S.C. § 523(a)(4))

50. Plaintiff Bank repeats and realleges the allegations in above paragraphs 1 through 46, inclusive, as though fully set forth herein.

51. As President of Chateau Julien, Brower was a fiduciary. In addition, under the Loan Documents, Chateau Julien was required to hold the collateral in trust upon the Bank's demand. Further, at all relevant times Brower was himself a chapter 11 debtor, owing a duty of loyalty to the estate and his creditors.

52. Brower destroyed all or substantially all of the books and records of Chateau Julien, which served as collateral for the Bank's Loan to Chateau Julien, without notifying the Bank. This was done despite notice to Brower of the Bank's demand that, as required under the Loan and Security Agreement, Chateau Julien was required to hold all of the collateral in trust for the Bank. The Bank was damaged by these actions in an amount up to the balance of the Loan. Such debt is non-dischargeable under 11 U.S.C. § 523(a)(4), as it involves fraud or defalcation while acting in a fiduciary capacity.

WHEREFORE, the Bank prays for judgment as set forth below.

## THIRD CLAIM FOR RELIEF

## (For Denial of Discharge Under 11 U.S.C. § 727(a)(2))

53. Plaintiff Bank repeats and realleges the allegations in above paragraphs 1 through 46, inclusive, as though fully set forth herein.

54. As set forth above, Brower has utilized American Commercial Properties to conceal his assets from his creditors. In particular, Brower upstreams money to American Commercial Properties in the form of $3,000 monthly rental payments which significantly exceed any amount owed on the $250,000 promissory note from 1992 that is secured by a deed of trust on the Residence. This allows Brower to effectively transfer money to his wife, the 100% owner of American Commercial Properties, so that he can enjoy the benefit of the funds without having them in his accounts and available to satisfy creditors.

55. This pattern of transferring and concealing Brower's funds by upstreaming them to his wife through rental payments to American Commercial Properties occurred during the year prior to bankruptcy and has continued after the bankruptcy filing. Brower has done this with an intent to hinder, delay, or defraud his creditors.

56. Brower should therefore be denied a discharge under 11 U.S.C. § 727(a)(2).

WHEREFORE, the Bank prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

## (For Denial of Discharge Under 11 U.S.C. § 727(a)(3))

57. Plaintiff Bank repeats and realleges the allegations in above paragraphs 1 through 46, inclusive, as though fully set forth herein.

58. As set forth above, Brower destroyed all of the business records of Chateau Julien after the commencement of this Bankruptcy Case. This was done despite the fact that (1) the records were collateral for the Loan, (2) the State Court Action was pending, (3) Chateau Julien and Brower had acknowledged the Bank's demand that Chateau Julien hold the collateral in trust for the Bank as required by the Loan and Security Agreement, (4) the Bank's noticed motion to appoint a receiver over Chateau Julien and to take possession of such records was then pending, and (5) this Bankruptcy Case was pending, with the largest claim listed on Brower's schedules

being the guaranty claim related to the Loan. The business records of Chateau Julien destroyed by Brower post-petition were records that would have allowed Brower's financial condition or business transactions to be ascertained, including his personal transactions with Chateau Julien and his transactions as a fiduciary of Chateau Julien.

59. There is no justification for Brower's conduct under the circumstances of this case. Brower's destruction of the records therefore requires denial of discharge under 11 U.S.C. § 727(a)(3).

WHEREFORE, the Bank prays for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bank prays for relief as follows:

1. On the First and Second Claims for Relief, an Order of this Court determining that the full amount of Brower's debts to the Bank, as such debts are set forth in the proof of claim filed by the Bank as Claim No. 7 on the claims register, is excepted from discharge and non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(4).

2. On the Third and Fourth Claims for Relief, an Order of this Court determining that Brower shall be denied a discharge in this Bankruptcy Case pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(3).

3. For such other and further relief as the Court deems just and equitable.

Dated: August 14, 2015     SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By:     /s/ *Michael M. Lauter*
MICHAEL M. LAUTER
Attorneys for Creditor and Plaintiff,
MUFG Union Bank, N.A.